**Tami LINNE, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 6632.**

Court of Appeals of Alaska.

Dec. 30, 1983.

Richard L. Yospin, Asst. Public Defender, Ketchikan, and Dana Fabe, Public Defender, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Following a jury trial, Tami Linne was convicted of two counts of theft in the second degree and one count of attempted theft in the second degree. The charges alleged that Linne obtained or attempted to obtain money by deception in violation of AS 11.46.180. Superior Court Judge Thomas Schulz sentenced Linne to serve five years in jail, with four years suspended, for each count of second-degree theft; he sentenced Linne to serve six months in jail for the attempted theft. All three sentences were made concurrent. Linne appeals her conviction and sentence. We affirm.

## FACTS

Over a period of approximately ten months, Tami Linne and her friend Theresa Brown obtained large sums of money from William Baenen. Baenen was a sixty-two year old Ketchikan resident who had accumulated more than $60,000 in savings over the course of a twenty-year career as a crane operator. According to Baenen, from May 1980, the first time he met Linne, through February 1981, he gave money to Linne on numerous occasions in response to her solicitations. Linne asked for money from Baenen for a variety of purposes, including: $300 to obtain an abortion; $800 for travel to obtain treatment for abortion complications; $400 because she had been robbed; $1,500 to "buy" a lucrative job as a cocktail waitress in Hawaii; $2,000 for travel, room and board for the Hawaii job; $1,200 to charter a helicopter and boat to search for her brother, who had died in a wilderness area; $3,200 for tuition at a beauty school in Seattle; $1,500 for living expenses while at the school; $1,900 to replace money stolen from Linne; $1,600 for an abortion after Linne was raped in Hawaii; $250 for cancer treatment; $1,000 for drug rehabilitation; $1,500 to post bail for Brown, who had purportedly been arrested in Seattle; $1,000 for a tubal ligation; and $700 for an appendectomy.

In late February 1981, Baenen gave Linne and Brown an additional $6,000 after

Linne told him that she had received an offer to work as a fashion model in New York City. Linne told Baenen she needed the money to spend on travel and living expenses for herself and Brown, who was to travel with Linne and assist her with her modeling career.

Baenen considered all of the money that he gave to Linne to be a loan. Baenen also indicated that he had fallen in love with Linne. Linne led Baenen to believe she loved him and intended to move into his apartment. According to Baenen, he had been willing to give Linne money because of his affection for her, because he believed the various stories Linne told him when she asked for money, and because he hoped that she would eventually live with him. Baenen indicated that if Linne had moved into his apartment to live with him, he would have been willing to forgive the money she owed him.

Eventually, Baenen realized that Linne was defrauding him. A friend of Baenen's convinced him to contact the police. Investigation soon revealed that the various reasons Linne had given Baenen in order to obtain money from him had been false. Linne actually spent the money she received from Baenen as she pleased. On March 12, 1981, with Baenen's cooperation, police obtained a warrant to monitor a conversation in which Linne asked Baenen to give her $7,000 so that she could pay off two men who had come to Ketchikan to beat her up because of a $15,000 drug-related debt that had not been paid.

Linne was subsequently indicted by the state. All of the transfers from Baenen to Linne from June 1980 through February 1981, with the exception of the $6,000 payment for Linne's New York modeling career, were included in a single count, which charged Linne with theft by deception in the first degree. The $6,000 payment Baenen made to Linne for her New York job was the basis for the third count, which charged Linne with theft by deception in the second degree. The fourth count, charging attempted theft by deception in

the second degree, was based on the request for $7,000 Linne made in March 1981.[1]

The charges against Linne were apparently prosecuted on three alternative theories. First, based on Baenen's testimony that the money he gave Linne was a loan, the state posits that deception occurred when Linne borrowed money from Baenen that she did not intend to repay. Second, the state maintains that deception was established by proof that Linne's reasons for obtaining money from Baenen were false. Third, the state asserts that Linne used promises to move into Baenen's apartment as a means of obtaining money from him and that these promises were false and therefore amounted to deception.

Linne's jury acquitted her of the first-degree theft charge in Count I of the indictment but convicted her of the lesser-included offense of second degree theft. The jury also found Linne guilty of the second-degree theft charged in Count III and the attempted second-degree theft charged in Count IV.

## VAGUENESS AND OVERBREADTH

Linne first contends that the trial court erred in refusing to dismiss her indictment because the crime of theft by deception is unconstitutionally overbroad and vague. We find little merit to Linne's claim.

AS 11.46.180 provides:

*Theft by deception.* (a) A person commits theft be [sic, by] deception if, with intent to deprive another of property or to appropriate property of another to himself or a third person, he obtains the property of another by deception.

(b) In a prosecution based on theft by deception, if the state seeks to prove that the defendant used deception by promising performance which he did not intend to perform or knew would not be performed, the intent or knowledge may not be established solely by or inferred solely from the fact that the promise was not performed.

---

1. Count II charged Theresa Brown.

(c) As used in this section, "deception" has the meaning ascribed to it in AS 11.81.900 but does not include falsity as to matters having no pecuniary significance or "puffing" by statements unlikely to deceive reasonable persons in the group addressed.

The term "deception" is defined in AS 11.81.900(b)(14):

"deception" means to knowingly

(A) create or confirm another's false impression which the defendant does not believe to be true, including false impressions as to law or value and false impressions as to intention or other state of mind;

(B) fail to correct another's false impression which the defendant previously has created or confirmed;

(C) prevent another from acquiring information pertinent to the disposition of the property or service involved;

(D) sell or otherwise transfer or encumber property and fail to disclose a lien, adverse claim or other legal impediment to the enjoyment of the property, whether or not that impediment is a matter of official record; or

(E) promise performance which the defendant does not intend to perform or knows will not be performed.

■ Linne complains that these statutes impinge on her constitutional right to freedom of speech [2] because they restrict a form of speech, namely, deceptive speech. This argument is mistaken. The statutory prohibition against theft by deception is not directed against speech. Rather, it is intended to prohibit the unlawful taking of property by means of deception. Thus, the statutory provisions regulate conduct; speech is restricted only incidentally, as an element of the conduct proscribed. Since the primary focus of the offense is on conduct and not speech, it does not impermissibly restrict the right to free speech. *See Summers v. Anchorage*, 589 P.2d 863, 867 (Alaska 1979); *Oyoghok v. Anchorage*, 641 P.2d 1267, 1268 (Alaska App.1982); *McKenzie v. Anchorage*, 631 P.2d 514, 517 (Alaska App.1981).

■ We similarly reject Linne's assertion that the statutory provisions dealing with theft by deception are impermissibly vague. Linne does not claim that these provisions have been arbitrarily enforced. Instead, she generally alleges that the definition of "deception" is too vague to afford adequate notice of the scope of conduct prohibited. However, we think that if the statute prohibiting theft by deception is read in conjunction with the definition of "deception," persons of ordinary intelligence would not need to guess at the meaning of the statutory language and would not differ significantly as to the scope of its application. We therefore conclude that these provisions afford adequate notice of the conduct forbidden and satisfy the requirements of constitutional due process.[3] *Williford v. State*, 674 P.2d 1329, 1332 (Alaska, 1983); *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 531 (Alaska 1980); *Summers v. Anchorage*, 589 P.2d at 867–68.

## SUFFICIENCY OF EVIDENCE TO SUPPORT THE INDICTMENT

■ Linne argues that the superior court should have dismissed her indictment because the evidence presented to the grand jury was insufficient. She contends, initially, that the statements she made to Baenen would not have constituted the common law crime of false pretenses. This claim, while technically correct, is of little consequence. Alaska's theft by deception statute was drafted with the specific purpose of encompassing a broader range of conduct than was included in the common law offense of false pretenses. In particular, the definition of "deception" contained in AS 11.81.900(b)(14) was meant to abrogate the common law rule restricting the crime of false pretenses to misrepresentations concerning existing facts. *See* Commentary on the

2. U.S. Const. amend. I; Alaska Const. art. I, § 5.

3. U.S. Const., amends. V and XIV; Alaska Const. art. I, § 7.

Alaska Revised Criminal Code, Senate Journal Supp. No. 47 at 35–37, 1978 Senate Journal 1399.

Linne next alleges that there was insufficient evidence to merit indictment under any of the specific theories relied on by the state.

█ Addressing the state's first theory of prosecution—that Linne borrowed money from Baenen without intending to repay— Linne argues that there was insufficient evidence to show Baenen ever loaned her money. Linne premises this argument on a belief that the state was required to produce some evidence of formal, written agreements between Baenen and Linne. However, the statutory definition of deception includes false promises, and there is nothing in the definition that would require loans by Baenen to Linne to be reduced to writing. AS 11.81.900(b)(14). Accordingly, we find no merit to Linne's argument. The grand jury could have found that Baenen loaned money to Linne, which she agreed to repay while knowing that she would not in fact repay.

█ Linne nevertheless maintains that she could not be convicted of deception based on mere proof of failure to repay. She relies on AS 11.46.180(b), which provides, in relevant part:

> In a prosecution based on theft by deception, if the state seeks to prove that the defendant used deception by promising performance which he did not intend to perform or knew would not be performed, that intent or knowledge may not be established solely by or inferred solely from the fact that the promise was not performed.

Here, however, the state did not rely on Linne's failure to repay Baenen as the sole evidence supporting its claim that she never intended to repay. The state established that Linne used a series of false statements to obtain money from Baenen, that she later told Baenen she would seek to obtain employment to earn enough money to repay him, and that these promises to find employment were themselves merely pretexts for obtaining additional money. Thus, the state relied on evidence showing a series of false representations about Linne's reasons for needing money to establish, circumstantially, that Linne had never intended to repay money she obtained from Baenen. We find that sufficient evidence of Linne's lack of intent to repay was presented to the grand jury by the state.

With respect to the state's second theory of prosecution—that Linne's misrepresentations of her need for money could constitute a basis for finding deception—Linne argues her misrepresentations could not constitute deception because they had no pecuniary significance. Linne relies on AS 11.46.-180(c), which states, in relevant part: "As used in this section, 'deception' . . . does not include falsity as to matters having no pecuniary significance . . . ." Linne's claim that her misrepresentations had no pecuniary significance assumes an extremely broad reading of the exception created by AS 11.46.180(c). In effect, Linne would have us define "pecuniary significance" to include only statements expressly dealing with the commercial terms of a transaction such as the date of repayment, the interest due, and the existence of collateral.

█ We disagree. The plain meaning of AS 11.46.180(c) is that deception cannot be found when the significance of a misrepresentation is unrelated to money or value. The significance—or practical effect—of a misrepresentation and not merely its literal meaning is the crux of the exception. As described in AS 11.46.180, theft by deception is characterized by the taking of property by misrepresentation. Any false statement that directly promotes or induces the transfer of valuable property or that relates to the amount or value of the property transferred will thus necessarily have pecuniary significance under the terms of the statute. The exception in AS 11.46.180(c) only applies to misrepresentations that do not directly promote or induce a "taking" of

property and that have no direct bearing on the amount or value of the property taken.[4]

Here, there was ample evidence that Linne made numerous misrepresentations to Baenen concerning various reasons why she was in desperate need of money; these misrepresentations directly led Baenen to give Linne the money she requested. The claim that Linne's misrepresentations had no pecuniary significance is thus without merit.

With respect to the state's third theory of prosecution—that Linne committed deception by falsely promising to live with Baenen—Linne again relies on the exception for statements having no pecuniary significance. She insists that her expressions of love for Baenen had no pecuniary significance and thus fall into the exception of AS 11.46.180(c). This argument mischaracterizes the state's theory. The state did not attempt to establish deception merely by proving that Linne claimed to love Baenen when in fact she did not. Rather, the state sought to show that in order to induce Baenen to continue giving her money, Linne knowingly created or confirmed the false impression that she intended to live with him. Evidence of Linne's false expressions of love for Baenen was only relevant insofar as it tended to support Baenen's testimony that Linne led him to believe she intended to live with him. Creation of this type of false impression is squarely within the statutory definition of "deception." AS 11.81.900(b)(14)(A). Linne's argument that the state relied on her statements of love for Baenen as the sole basis for establishing deception is without merit.

In summary, we find no merit to Linne's claim that insufficient evidence of decep-tion was presented to the grand jury; we therefore hold that the trial court properly rejected Linne's motion to dismiss her indictment.

## REJECTION OF PROPOSED JURY INSTRUCTIONS

Linne further contends that Judge Schulz improperly refused to give several of her proposed jury instructions. First, Linne maintains, that her proposed instruction describing the essential elements of theft by deception should have been given to the jury. This instruction differed from the instruction actually given primarily in that it defined the terms "pecuniary" and "reasonable person." We first consider Linne's argument with respect to the definition of the word "pecuniary."

As we have already indicated, Linne incorrectly interpreted the language of AS 11.46.180(c), which excludes statements "having no pecuniary significance" from the statutory definition of "deception," to mean that only misrepresentations expressly dealing with the formal terms of a transaction could constitute "deception." Although the definition of "pecuniary" contained in Linne's proposed jury instructions was slightly broader than the narrow interpretation of AS 11.46.180(c) that she argued for prior to trial, it was intended to support that interpretation.

The relevant portion of Linne's proposed instruction stated:

Deception does not include falsity as to matters having no pecuniary significance. "Pecuniary" means of or relating to money. So,.even if you find that the defendant knowingly deceived William Baenen in obtaining or attempting to obtain

4. Our interpretation of AS 11.46.180(c) is supported by the legislative commentary to this provision, which states, in relevant part:

Section 180(c) provides that "deception" does not include falsity as to matters having no pecuniary significance, such as a false statement by a car salesman that he belongs to the Elks in order to sell a car to an enthusiastic Elk.

Commentary on the Alaska Revised Criminal Code, Senate Journal Supplement No. 47 at 37, 1978 Senate Journal 1399. In the Commentary's example, although the misrepresentation was arguably causally related to purchase of the automobile, it does not directly or indirectly involve the price paid or value received by the purchaser, and it does not directly induce or promote the purchase. The misrepresentation can be deemed to be an inducement in only an indirect and attenuated way that is wholly unrelated to value.

property of William Baenen, but that any false statement made to Mr. Baenen had no pecuniary significance, then there is no "deception" within the meaning of the law, and that element is not present with regard to the crime charged.

Because Linne's proposed instruction defined only the word "pecuniary," rather than the statutory term "pecuniary significance," it might well have misled the jury to believe, in keeping with Linne's interpretation of AS 11.46.180(c), that an express misrepresentation as to the pecuniary terms of a transaction was required before deception could be established. As previously noted, Linne's reading of AS 11.46.180(c) was mistaken. Based on this finding, we believe Judge Schulz properly refused to give Linne's definition of the word "pecuniary."

Linne's proposed instruction on the elements of theft by deception also contained the following definition of "reasonable person":

A "reasonable person" is an average one of ordinary prudence, a hypothetical person who is both prudent and careful. As a jury, you are to consider only whether or not such a reasonable person would be deceived by statements alleged to be made by the defendant. You are not asked to consider whether or not William Baenen was actually deceived by any such statements. In other words, the standard for determining whether a reasonable person would be deceived is objective, not subjective.

As is apparent from this definition, Linne believed the crime of theft by deception was governed by an objective standard: a misrepresentation could not amount to deception unless it would deceive a reasonable person. According to the proposed instruction, it was immaterial that Linne actually deceived William Baenen, as long as a reasonable person would not have been deceived. We find that Linne's instruction conflicts with the plain meaning of the law and with the basic policy underlying the prohibition of theft by deception.

The offense of theft by deception is plainly intended to protect unwary members of the public from a broad range of fraudulent or deceptive schemes. To carve out of the offense a blanket exception for victims whose deception might be deemed unreasonable would be anomalous. Those who engage in deception for pecuniary gain quite naturally tend to select as their victims people who are the most susceptible to misrepresentations. The victims of deceptive schemes will frequently be particularly vulnerable people. If guilt of theft by deception were determined by an objective, reasonable person standard, those who stand in greatest need of protection against deceptive schemes would in effect be declared fair game. Instead of discouraging the use of deceptive means to obtain property, the theft by deception statute would do no more than encourage offenders to be selective in their choice of victim.

The statutory definition of "deception" contained in AS 11.81.900(b)(14) provides no support for the proposition that an objective, reasonable person standard should be applied in theft by deception cases. This definition indicates an intent by the legislature to require a subjective standard: the jury need only find that the victim of false claims was actually deceived. The only statutory reference to an objective standard occurs in the portion of AS 11.46.-180(c) that provides: " 'deception' does not include ... 'puffing' by statements unlikely to deceive reasonable persons in the group addressed." The scope of this provision is limited; it merely applies the reasonable person standard to cases involving "puffing."[5]

5. Linne does not challenge the definition of "puffing" actually given at trial. The jury instructions defined "puffing" according to the common meaning of the word:

Deception also does not [include] "puffing." ["Puffing"] is defined as the making of extravagant praise, commendation or claim, for example, a seller's praise of the virtues of something offered for sale, which is unlikely to deceive reasonable people in the group addressed.

We find no basis for Linne's claim that an objective standard should be applied to the entire theft by deception statute, and we therefore conclude that the trial court properly refused to give Linne's proposed instruction describing the reasonable person standard.

Linne additionally disputes Judge Schulz's refusal to give her proposed instructions defining "loan" and "gift." We believe that the ordinary meaning of both words is widely known and is well within the grasp of average jurors. Technical definitions of these words would have been of little relevance to Linne's case. Although Linne maintains that the legal distinctions between a loan and a gift were crucial, her position is based on the faulty premise that the jury would not have been entitled to convict unless they found that Baenen made legally enforceable loans of money to Linne. Applying the statutory definition of "deception" to this case, however, it would make little difference whether Baenen was found to have given money to Linne as a loan or as a gift. The offense of theft by deception focuses on the means used to obtain property, not the actual method by which property is conveyed. As long as the jury found that Linne obtained money from Baenen by means of deception—by creating or confirming a false impression that she did not believe to be true or by promising performance that she did not intend to perform—conviction would be justified regardless of whether Linne obtained the money as a gift, as a formal loan, or as an informal loan—one that did not meet all legal requirements of enforceability. AS 11.81.900(b)(14)(A), (E). We hold that the trial court's refusal to define "gift" and "loan" was not an abuse of discretion.

We have reviewed the jury instructions given by Judge Schulz and conclude that they adequately set forth all essential elements of theft by deception. The instructions also appropriately incorporate the definition of "deception" that is contained in AS 11.81.900(b)(14). We hold that Judge Schulz did not abuse his discretion in failing to give additional instructions concerning the elements of the offense. See Buchanan v. State, 561 P.2d 1197, 1207 (Alaska 1977); Thomas v. State, 522 P.2d 528, 531–32 (Alaska 1974).

## DISCLOSURE OF FINANCIAL RECORDS

Prior to trial, Linne moved for production of all bank records of William Baenen, from May 1980 through March 1981. Judge Schulz found Linne's request to be too broad and denied it. However, he ordered the state to disclose all financial records upon which it intended to rely. Judge Schulz specifically indicated that he meant his order to allow Linne the full scope of discovery permitted under the provisions of Criminal Rule 16. Linne contests Judge Schulz's disclosure order.

Linne's request for disclosure encompassed all of Baenen's financial records, regardless of whether they related to payments by Baenen to Linne.[6] The only reason Linne gives for seeking disclosure of all financial records is that the records might have shed light on Baenen's ability to spend money on Linne and the sources of his funds. However, Linne never contested that Baenen made payments to her. Given Judge Schulz's order requiring the state to disclose all records upon which it intended to rely, it is difficult to see how disclosure of additional information concerning Baenen's ability to pay or his sources of income could have been relevant to Linne's case.

Linne has failed to make any showing of actual prejudice stemming from the limited scope of disclosure ordered by Judge Schulz. Nor has Linne shown that she was deprived of relevant evidence or unfairly surprised at

---

**6.** Linne also acknowledges that her request for disclosure covered a period of time greater than that included within her indictment. The first count of Linne's indictment charged an ongoing theft beginning on or about June 2, 1980, and ending February 19, 1981. Count III alleged a theft on February 26, 1981. The last count charged an attempted theft on or about March 9, 1981.

any time during her trial. We hold that Judge Schulz did not abuse his discretion in restricting Linne's access to Baenen's financial records.

## PROBABLE CAUSE FOR ISSUANCE OF THE WARRANT FOR ELECTRONIC SURVEILLANCE

Prior to trial, Linne moved to suppress all evidence obtained by police as a result of the search warrant authorizing electronic monitoring and recording of her conversation with Baenen on March 12, 1981. Linne also moved for dismissal of her indictment, contending that it was based in part on information obtained pursuant to the warrant. Judge Schulz denied Linne's motions to suppress and dismiss; she renews her arguments on appeal.

Linne contends that the only evidence of unlawful conduct on her part contained in the affidavit supporting the challenged warrant is the conclusory allegation by William Baenen that Linne was deceiving him. Linne asserts that this conclusory allegation is insufficient to establish probable cause.

The challenged warrant was supported by the affidavit of Ketchikan Police Lieutenant Pat Orton, who averred, in relevant part:

3. That at approximately 2300 hours on 3–9–81, Officer Perry and Lt. Orton contacted Mr. Baenen and learned that during the past 8 months Tami Linne had solicited and received in the neighborhood of $40,000 from him.

4. That on 3–10–81 Officer Perry contacted Mr. Baenen's bank and obtained the following information from checking receipts or withdrawal stubs with the dates it was withdrawn to whom it was made payable to and the amount.

| DATE | NUMBER | PAYABLE TO | AMOUNT |
|------|--------|-----------|--------|
| 1/6/81 | 144748 | Shelly Brown | $1,500.00 |
| 2/5/81 | 021688 | William J. Baenen | $1,200.00 |
| 2/19/81 | 021880 | Tami Linne | $3,000.00 |
| 2/19/81 | 021881 | Tami Linne | $2,000.00 |
| 2/24/81 | 021886 | William J. Baenen | $1,500.00 |
| 2/24/81 | 021887 | Theresa Brown | $2,500.00 |
| 3/4/81 | 021894 | Theresa Brown | $4,000.00 |
| 3/4/81 | 021896 | William J. Baenen | $1,000.00 |

It should be noted that all of the above checks are drawn from the National Bank of Alaska, Anchorage, AK. Mr. Baenen also obtained copies of two checks drawn . . . in November of 1980 described thusly:

| 11/10/80 | 43955 | Tami Linne | $3,200.00 |
| 11/13/80 | 44019 | Tami Linne | $1,634.00 |

5. Affiant and Officer Perry were also advised by Mr. Baenen that on 3–9–81 Ms. Tami Linne again solicited Mr. Baenen to give her money, $7,000, to allegedly prevent her and her friend, Ms. Theresa Brown, from being beaten up by some male subjects that are allegedly attempting to collect $15,000 from them for a past obligation.

\* \* \* \* \* \*

9. That Mr. Baenen has advised affiant and Officer Perry that he has paid Ms. Linne and Theresa Brown the sums above mentioned based on their [representations] over the past several months that Mr. Baenen now believes were falsely and deceitfully made and fraudulently intended.

\* \* \* \* \* \*

11. That on March 11, 1981 Tami Linne, Theresa Brown did hold a conversation with Mr. Baenen and during this conversation did again attempt to solicit this $7,000 from him, and another meeting was set up by the three of them again on March 12, 1981.

Linne is correct in observing that paragraph nine of the affidavit is conclusory in stating Baenen's opinion that Linne's representations to him were "falsely and deceitfully intended." However, this language cannot be read in isolation. The entirety of the affidavit must be read in a reasonable and common-sense manner and great deference must be given to the magistrate's determination of probable cause. *Resek v. State,* 644 P.2d 877, 879 (Alaska App.1982); *Kralick v. State,* 647 P.2d 1120,

1123–24 (Alaska App.1982); and *Rosa v. State,* 633 P.2d 1027, 1029–30 (Alaska App. 1981).

 According to the affidavit, Baenen gave Linne approximately $40,000 over a period of less than a year. Police investigation of Baenen's bank records confirmed nearly $20,000 in payments or withdrawals over a period of about four months. Furthermore, the affidavit stated that Linne had requested an additional $7,000 to "prevent her and her friend, Ms. Theresa Brown, from being beaten up by some male subjects that are allegedly attempting to collect $15,000 from them for a past obligation." We believe Linne's reason for requesting $7,000 from Baenen, as stated in the affidavit, could be construed to be implausible on its face.

The nature of Linne's request for $7,000 might not, standing alone, establish probable cause to believe that she was attempting to deceive Baenen. We believe, however, that when the implausibility of Linne's reason is considered with the large sums of money Linne had already solicited from Baenen and with Baenen's subjective belief that he was being deceived, the affidavit provides an ample basis for the conclusion that Linne's request for $7,000 was deceptive. A magistrate reading Lieutenant Orton's affidavit as a whole could reasonably conclude that the March 12 meeting between Linne and Baenen would likely yield evidence of an attempted theft by deception. Accordingly, we hold that Judge Schulz did not err in refusing to suppress evidence resulting from execution of the warrant for electronic surveillance.[7]

## ADMISSIBILITY OF VIDEOTAPED INTERVIEW

Linne next contends that the trial court erred in refusing to suppress a videotape in which she was interviewed by police about money she received from Baenen. After investigation of Linne's case had begun, Officer Perry of the Ketchikan police arrested Linne on an outstanding bench warrant for failure to appear in court on a traffic matter. Upon arrest, Linne was taken to the Ketchikan police station, where she was advised of her *Miranda* rights. Officer Perry then questioned Linne about her involvement with Baenen and the manner in which she spent the money that Baenen gave her. The videotape of the interview was shown to the jury during Linne's trial.

 Linne concedes that the bench warrant for her traffic arrest was valid. She maintains, however, that the arrest itself was merely a pretext for the police interview that followed. Thus, she argues that the videotape of the interview should have been suppressed from evidence at trial. Linne presented the same argument in a pretrial motion to suppress. After conducting a hearing, Judge Schulz denied Linne's motion to suppress. He found that the arrest warrant was valid, that it had not been issued for reasons connected to the theft investigation, and that it had been served on Linne in good faith. Judge Schulz also found that, following her arrest, Linne agreed to be interviewed by Officer Perry and that she knowingly, intelligently and voluntarily waived her *Miranda* rights before being questioned.

 Upon review of the record, we cannot conclude that Judge Schulz was clearly erroneous in his findings on these issues. *Whitton v. State,* 533 P.2d 266, 268 (Alaska 1975). We therefore hold that Linne's motion to suppress was properly denied.[8]

---

7. Assuming, without deciding, that reliance on illegally obtained evidence would require dismissal of an indictment, we similarly conclude that Judge Schulz properly denied Linne's motion to dismiss her indictment on this ground.

8. Linne additionally contends that significant portions of the videotape should have been excluded as hearsay. Specifically, Linne challenges the admissibility of Officer Perry's ques-

tions, many of which were premised on hypothetical facts. We reject Linne's argument. It is apparent, in context, that the state did not introduce the videotaped interview to establish the truth of the hypothetical facts asserted by Officer Perry's questions. The significance of the interview was not in Perry's questions, but rather in Linne's responses, many of which were highly incriminating when

## SENTENCE

Linne's final contention is that her sentence is excessive. Linne was convicted of two counts of second-degree theft and one count of attempted second-degree theft. Second-degree theft is a class C felony, punishable by a maximum term of five years' imprisonment; attempted theft in the second degree is a class A misdemeanor, punishable by one year in jail. Judge Schulz sentenced Linne to serve concurrent terms of five years with four years suspended on the two felony convictions; he imposed a six-month term, also concurrent, for the misdemeanor conviction. Judge Schulz ordered restitution of $12,000 and required that Linne be given a work release while she served the year of unsuspended imprisonment.

 Linne's primary argument is that the five-year sentences she received for the two counts of second-degree theft are in effect maximum sentences, even though four years of imprisonment was suspended on each count. This contention is inaccurate. Although the totality of the sentence, including suspended time, must be considered in determining whether it is excessive, a suspended term of imprisonment is not the equivalent of an unsuspended sentence. Accordingly, Linne did not receive maximum sentences, and Judge Schulz was not obligated to find that she was a worst offender. *See Wertz v. State,* 611 P.2d 8, 10 (Alaska 1980); *Ferreira v. State,* 602 P.2d 803, 806 (Alaska 1979); *Spearman v. State,* 543 P.2d 202, 205 (Alaska 1975); *Nashoalook v. State,* 663 P.2d 975, 980 (Alaska App.1983); *Tazruk v. State,* 655 P.2d 788, 789 (Alaska App.1982).

In imposing Linne's sentence, Judge Schulz took into account her juvenile history, which included a theft offense, as well as the protracted nature of her current offenses and the significant amount of money involved. Considering the sentencing record as a whole, we conclude that Linne's sentence is not clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

Linne's conviction and sentence are AFFIRMED.

---

viewed in light of other evidence presented in the case. Since the jury could not have understood Linne's responses without hearing the questions that elicited them, the questions were highly probative and it would not have been realistic to exclude them. In any event, many of the facts implied in Officer Perry's questions were established by independent evidence. To the extent that potential prejudice arose from use of the questions, it was cured by Judge Schulz's instruction specifically cautioning jurors to refrain from considering Officer Perry's questions as evidence of the truth of matters asserted therein.