James R. **LIPSCOMB**, Appellant,

v.

**STATE of Alaska**, Appellee.

Nos. A–67, A–68.

Court of Appeals of Alaska.

May 24, 1985.

Mary E. Greene, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

James R. Lipscomb challenges his convictions for robbery and failure to appear. He also appeals the sentence imposed on the robbery. We affirm.

## I. FACTS

On August 28, 1979, at approximately 7:10 p.m., Fairbanks police were called to the apartment of John O'Donnell in the Northward Building. O'Donnell told Officer Donald LaSage that he had been

robbed. According to O'Donnell, he was returning to his apartment around 6:45 when a man followed him up the elevator and approached him outside his door. The man told O'Donnell he had a gun, and kept one hand under his jacket. They entered the apartment, and the man demanded O'Donnell's money and jewelry. The man ordered O'Donnell to remove his leather jacket, which the man eventually traded for the plaid jacket he was wearing. The man searched the drawers of O'Donnell's dresser, and took several rolls of coins. In addition, he took nearly $500 in currency, another leather coat, a television, a portable radio, O'Donnell's watch and two rings. Before leaving, the man tied O'Donnell's hands with a cord pulled from a lamp in the apartment. O'Donnell managed to free himself a short time later, and called the police immediately from the lobby of his building.

Officer LaSage noted that clothes were scattered around the apartment, that the dresser drawers were out, and that there were ligature marks on O'Donnell's wrists. Detective Nielsen arrived later, and noted that the marks matched in width a cord apparently ripped from a brass lamp on a nightstand.

Police were able to locate a cab driver who picked up a man outside the Northward Building at approximately 7:10 p.m. The man had been wearing a leather jacket and carrying a radio and television set, which the driver helped him carry from the cab to his apartment. The cab driver took police to the apartment. The police waited there, and James Robert Lipscomb arrived at approximately 10:30 p.m. He was wearing a brown leather coat, and had on his person several rolls of coins and several dollars in loose change.

Lipscomb was arrested and interviewed by Detective Nielsen a short time later. Lipscomb told Nielsen that a homosexual patron had been giving him money for sexual favors over the past few months, and that the leather coat had been a gift from this man, whose name Lipscomb either did not know or refused to disclose. At the time of the police interview, Lipscomb's blood alcohol was .20%.

Police obtained a search warrant for Lipscomb's apartment and executed it the next day. In Lipscomb's closet they found another leather jacket and, in a shirt pocket, $500 in currency, in denominations consistent with Lipscomb's guilt. In a kitchen storage area, police found a television with "Northward Building" engraved on the top and a radio. On September 3, 1979, an employee of Lipscomb's apartment complex gave police two rings and a watch matching the descriptions given by O'Donnell, which were apparently hidden in a coffee jar in Lipscomb's apartment.

On September 5, 1979, O'Donnell and the cab driver, Melford Dunn, appeared before a grand jury and testified to the above facts. Lipscomb was indicted for robbery. Former AS 11.15.240. On October 11, 1979, Lipscomb was released to a residential alcohol treatment program. Sometime in the next few weeks Lipscomb fled to Hawaii and failed to appear at a scheduled omnibus hearing. A bench warrant was issued.

In late 1979, O'Donnell went into a coma and died. Lipscomb was arrested in January 1980 in Oregon on another matter. Oregon officials discovered a Texas parole violation warrant under Lipscomb's name, and he was transferred to Texas where he remained incarcerated until July 1981. Lipscomb returned to Alaska in early 1982. He was convicted of several misdemeanors in Anchorage under the name Ronald Lee Lipscomb. Finally, when he was arrested on a trespass charge in Anchorage on December 6, 1982, a warrant check turned up the Fairbanks bench warrant on a James Lipscomb. On December 14, 1982, Lipscomb was indicted for failure to appear. AS 12.30.060(1).

Lipscomb filed several pretrial motions relating to the issues raised now on appeal. At trial on the robbery charge, Officer

LaSage and Detective Nielsen were allowed, over Lipscomb's objection, to testify as to what O'Donnell told them when they arrived at his apartment. The prosecution did not present O'Donnell's grand jury testimony. The tape of Lipscomb's interview with Detective Nielsen on the night of his arrest was played for the jury.

Lipscomb was convicted of the robbery charge. He then entered a plea of *nolo contendere* on the failure to appear, preserving for appeal the issue whether the court should have dismissed the indictment on that charge because of pre-indictment delay. *See Cooksey v. State*, 524 P.2d 1251 (Alaska 1974). He was given concurrent sentences of fifteen years with five suspended on the robbery and one year on the failure to appear.

In addition to the pre-indictment delay argument, Lipscomb argues on appeal that the robbery indictment should have been dismissed because the prosecutor failed to present the tape of his police interview to the grand jury; that the court should have excised portions of the interview before it was played for the petit jury; that the police should not have been allowed to testify as to O'Donnell's statements to them; that the court improperly allowed and emphasized evidence of flight; and that his robbery sentence is excessive.

## II. DISCUSSION

A. *Failure to present exculpatory evidence to the grand jury.*

■ Lipscomb argues that the state's failure to play to the grand jury the tape of his interview with Detective Nielsen on the night of his arrest violated the rule of *Frink v. State*, 597 P.2d 154 (Alaska 1979),

so that his motion to dismiss the indictment should have been granted. In *Frink*, the Alaska Supreme Court held that the prosecutor has a duty to present exculpatory evidence to the grand jury pursuant to Criminal Rule 6(q).[1] *Frink*, 597 P.2d at 164. The court quoted with approval the relevant ABA standard, which states that "The prosecutor should disclose to the grand jury any evidence which he knows will tend to negate guilt." [2] The court went on to state that this obligation

> does not turn the prosecutor into a defense attorney; the prosecutor does not have to develop evidence for the defendant and present every lead possibly favorable to the defendant.

*Frink*, 597 P.2d at 166. Moreover, only material substantially favorable to the defendant need be presented. *Dyer v. State*, 666 P.2d 438, 444–45 (Alaska App.1983); *Tookak v. State*, 648 P.2d 1018, 1021 (Alaska App.1982).

Lipscomb's argument requires us to examine the taped interview with Detective Nielsen in some detail. The session began with Nielsen advising Lipscomb of his rights. Lipscomb stated that he was willing to talk. When advised of the charge against him, Lipscomb stated, "I haven't robbed nobody." When asked where he got the leather coat he was wearing, Lipscomb said that it came from a homosexual friend, an "old man" forty-five or fifty years old who lived in the Northward Building. According to Lipscomb, this man paid Lipscomb for sexual favors "three or four times," including the day before, when the man gave him about $300. Lipscomb did not know what room the man lived in, despite having been to the apartment "several times," nor did he know the man's name.

---

1. Criminal Rule 6(q) provides, in relevant part:
 When the grand jury has reason to believe that other available evidence will explain away the charge, it shall order such evidence to be produced and for that purpose may require the prosecuting attorney to subpoena witnesses.... The grand jury shall find an indictment when all the evidence taken to-

gether, if unexplained or uncontradicted, would warrant a conviction of the defendant.

2. ABA Standards Relating to the Prosecution Function and the Defense Function § 3.6(b) (Approved Draft 1971).

Lipscomb went on to state that he and the man had a "falling out" the last time Lipscomb saw him, "a couple of days ago," because Lipscomb refused to perform certain sexual acts. When asked about the rolls of coins found on his person, Lipscomb said that he had had them for three or four days, but also that he had gotten them from the man at the Northward. At this point Nielsen began to press Lipscomb, telling him that his "friend" claimed Lipscomb stole the jacket, the coins and some other things, and that police were going to get a search warrant and search his house. Lipscomb gave permission to search the house. Lipscomb denied owning a gun, but stated that the man at the Northward had several guns.

In the next section of the interview, Nielsen attempted to get Lipscomb to give an account of his activities that day. After Lipscomb stated he was not downtown that day, Nielsen told Lipscomb several people had seen him downtown and identified him. Lipscomb eventually stated that he did go downtown that morning to see his doctor. Lipscomb refused to give his doctor's name, however. Lipscomb said he went to several bars, then took a cab home. He stopped at a liquor store and bought a bottle before coming home. Lipscomb then explained that when he said "morning" earlier he had meant afternoon, because he doesn't get up until afternoon.

When confronted again with the accusation of robbery, Lipscomb claimed that the man at the Northward gave him the jacket he was wearing and another dark leather jacket, a radio, a television, three rings and a gold chain. He also said the man had given him over $1000 in cash over the preceding month. Lipscomb went on to say that the man had given him those things that same evening, that the man got very angry when Lipscomb refused to perform a certain act, and said "if that's the way you're going to be—if you want the

stuff take it." When the man said "get out," Lipscomb just took the things and left. Lipscomb said he really didn't remember what he took: "And what he gave me I can't tell you. All I know is I went home." A short time later, the following colloquy occurred:

> Nielsen: Okay. You and he had a little spat tonight or fight of some sort and well, you just said, "I'm not gonna take this shit," or what?
>
> Lipscomb: No, it wasn't like that.
>
> Nielsen: How was it? What was it like, Bobby? Because, I heard his side, but I haven't heard your side.
>
> Lipscomb: He just said, "Take what you want. I don't give a fuck any more." [Indiscernible] you know, he said, "You want this, you want that, that's it." [Indiscernible] like that.
>
> Nielsen: Okay. Did you tie him up? He said you tied him up.
>
> Lipscomb: Tie him up?
>
> Nielsen: That's what he said.
>
> Lipscomb: No, I never tied anything.

Lipscomb next stated that he remembered being at the Northward with the television, and remembered taking a cab home, but that was about it. When pressed further, Lipscomb denied taking anything against the man's will. He then told Nielsen that he had a drink with the man in the bar at the Northward Building that evening; then they both took the elevator up to the man's apartment. Lipscomb denied leaving a shirt in the apartment. Nielsen terminated the interview at this point and gave Lipscomb a breathalyzer test. The result was .20% blood alcohol content.

Lipscomb does not assert that his statement to Nielsen was corroborated in any material way by any facts discovered by police before the grand jury was convened.[3] He nevertheless asserts that the prosecu-

---

**3.** In fact, the state later sought to introduce evidence of a phone call made to police on

October 2, 1979, almost a month after the indictment was returned, in which Lipscomb appar-

tion was obligated to present it as exculpatory evidence to the grand jury.

■ There is some authority indicating that a denial of guilt by the accused may be considered exculpatory material for purposes of evaluating whether the prosecutor has a duty to present particular evidence to the grand jury. *Cf. Doisher v. State*, 632 P.2d 242, 251 (Alaska App.1981), *rev'd on other grounds*, 658 P.2d 119 (Alaska 1983) (where defendant made several denials of guilt, and one was presented to the grand jury, defendant suffered no prejudice as a result of the prosecutor's failure to introduce the others). In this case certain statements by Lipscomb must unquestionably be viewed as denials of guilt. Yet the structure of the interview as a whole was such that Lipscomb tended to contradict earlier statements every time he revealed new information. The exculpatory quality of the interview is severely undermined by the fact that Lipscomb contradicted himself so frequently in discussing his activities. When we consider Lipscomb's intoxication, the inherent unbelievability of his final version of events, the vague and sometimes evasive nature of Lipscomb's replies, and his strong motivation to fabricate along with the fact that Lipscomb repeatedly contradicted himself, we have difficulty in con-

cluding that the taped interview was evidence "substantially favorable" to Lipscomb. We note in passing that the prosecutor felt the interview was sufficiently *inculpatory* to present it as part of his case-in-chief at trial. Accordingly, we conclude that, even if Lipscomb's denial would have been admissible before the grand jury as an exculpatory statement, the exclusion did not constitute error.[4]

B. *Refusal to excise material from the taped interview.*

■ Despite the fact that he was arguing that the taped interview should have been presented to the grand jury, Lipscomb also moved on various grounds to have the tape suppressed from evidence at trial. In the alternative, Lipscomb asked the court to strike "all of the hearsay" contained in the statement.[5] The hearsay statements were contained in questions that Nielsen asked Lipscomb. The questions contained information concerning the robbery that had been supplied by O'Donnell and the cab driver who drove Lipscomb from the scene. In trying to get Lipscomb to talk of his activities, Nielsen also told Lipscomb other people had seen him downtown on that day. *See* part II A, *supra.*

Lipscomb's motion was denied without findings. The entire tape was played for the jury.

ently recanted most of his story. This evidence was suppressed on the grounds that the officer who took the call knew that Lipscomb was represented by counsel at the time of the call. Lipscomb testified at an evidentiary hearing that he did call Nielsen about another matter, but never said he had been lying about O'Donnell's homosexuality or any part of his story. The trial court made no findings of fact with regard to the substance of the October 2 telephone conversation.

**4.** Even if the prosecutor should have played the tape for the grand jury, it is far from clear that the indictment should have been dismissed. O'Donnell and the cab driver who took Lipscomb home each testified without equivocation before the grand jury about the events of August 28. O'Donnell's testimony directly contradicted the statements by Lipscomb. This testimony, along with the physical evidence found on Lipscomb's person and in his apartment, was more than enough for the grand jury to return a true

bill, even if Lipscomb's statement had been played with all inculpatory material deleted. *See Tookak v. State*, 648 P.2d at 1021 (strength of other evidence before grand jury rendered failure to introduce exculpatory material harmless); *see also Giacomazzi v. State*, 633 P.2d 218 (Alaska 1981) (if other evidence presented will justify the indictment, use of inadmissible hearsay will not be deemed to vitiate it).

**5.** Lipscomb also asked to have suppressed "other portions" of the statement that were not relevant to the robbery but involved other possible crimes. Lipscomb did not specify which portions, but was apparently referring to statements he made about beating someone up. Lipscomb's argument concerning this portion of the interview has not been mentioned in his appellate briefing. We find that the point has been abandoned.

On appeal, Lipscomb argues that the questions containing hearsay should have been excised. He also argues, for the first time, that the court should have excised some of Lipscomb's own statements—*e.g.*, that he was a drug addict, an alcoholic, and mentally unstable—because of the prejudice they might generate.

■ Lipscomb's hearsay argument is governed by our decision in *Linne v. State*, 674 P.2d 1345, 1356 n. 8 (Alaska App.1983). Just as the state in *Linne* did not introduce the questions put forward by the officer to establish the hypothetical facts they contained, Detective Nielsen's questions here were not admitted to establish the truth of their contents. *Id.* Lipscomb's responses, even more so than Linne's, would have been nonsense without the questions eliciting them. Finally, just as there was other evidence in Linne's case establishing the subject matter of most of the questions, the jury in Lipscomb's case heard testimony from Detective Nielsen, Officer LaSage and the cab driver establishing that a robbery had occurred and implicating Lipscomb in it.

Lipscomb complains that a cautionary instruction should have been given, but apparently none was requested; Lipscomb cites no cases supporting the proposition that a judge must instruct *sua sponte* under these circumstances. We conclude that admission of the information contained in Detective Nielsen's questions on the audio tape, if error, was harmless.

■ Finally, because Lipscomb's argument concerning his own references to drug addiction and alcoholism was not raised below, it must be analyzed under the plain error standard. Alaska Criminal Rule 47(b). We hold that admission of these remarks does not rise to the level of plain error.

### C. *Admission of hearsay testimony by police.*

Prior to trial, the state sought permission to introduce the statements by O'Donnell to Officer LaSage and Detective Nielsen through the testimony of the two officers, relying upon three hearsay exceptions. Lipscomb challenged this motion on the grounds that the proposed testimony was not within any hearsay exception and would violate his confrontation rights. The court ruled the testimony admissible, without stating which exception or exceptions were applicable. The court also rejected Lipscomb's motion to reconsider the ruling at trial, after listening to *voir dire* testimony by Officer LaSage about the circumstances of the statements. Both officers were allowed to testify about O'Donnell's statements to them immediately after the robbery.

Lipscomb argues on appeal that allowing this testimony was reversible error. We hold that most of the challenged testimony was properly admitted under the "excited utterance" exception to the hearsay rule. A.R.E. 803(2).

Questioning of Officer LaSage on *voir dire* during the trial established that O'Donnell freed himself about five minutes after Lipscomb left the apartment and immediately went down to the lobby to call police. Officer LaSage knocked on O'Donnell's door within five minutes after the call.[6] O'Donnell immediately told LaSage that he had been robbed and began relating the basic facts of the robbery.[7] LaSage then asked for the details of chronology

---

**6.** O'Donnell told Officer LaSage that he entered his apartment with the man from the elevator at approximately 7:00 p.m. LaSage arrived at the building at 7:15 and "began listening to" O'Donnell at 7:17. We conclude from this that no more than five minutes could have elapsed from the time O'Donnell freed himself and the time he first spoke to Officer LaSage.

**7.** LaSage's testimony on *voir dire* included the following exchange:

Q: And in general terms as you proceeded in the course of an investigation can you tell us some of the things you might have observed, either that he pointed out to you or you observed for yourself?

and began making a list of what had been taken, notes about the appearance of the apartment, *et cetera.* LaSage called Nielsen, who arrived about a half-hour after LaSage. LaSage described O'Donnell as "calm" in the police report, but stated on *voir dire* that he meant by this only that O'Donnell "wasn't jumping around the room and carrying on." LaSage stated that O'Donnell was angry about the robbery, and angry that he had been too afraid to try to stop Lipscomb, because he thought Lipscomb had a gun. Nielsen later described O'Donnell as "angry" and visibly upset but not "excited."

The testimony LaSage gave when the trial resumed was consistent with his testimony on *voir dire.* It included more information about the robbery, as related to LaSage by O'Donnell. The items recovered from Lipscomb had already been admitted into evidence, and they were now shown to Officer LaSage. LaSage was allowed to testify that most of the items he was being shown wer described by O'Donnell as being stolen.

Later in the trial, Detective Nielsen testified about the appearance of O'Donnell's apartment when he arrived. Nielsen also indicated that O'Donnell gave him "basically the account that was given by Officer LaSage as to what occurred."

■ Alaska Rule of Evidence 803(2) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. Decisions about the admissibility of evidence are committed to the sound discretion of the trial court. *Hawley v. State,* 614 P.2d 1349, 1361 (Alaska 1980). A trial court's determination that a statement falls within the excited utterance exception to the hearsay rule necessarily depends on the facts peculiar to each case and should not be reversed on appeal unless clearly erroneous. *State v. Agoney,* 608 P.2d 762, 764 n. 5 (Alaska 1980). In *Agoney,* the supreme court concluded that answers given during interrogation conducted ninety minutes after the crime, sixty minutes of which the declarant spent alone in a patrol car, may have been the product of reflection, and should not have been admitted as excited utterances. The commentary to A.R.E. 803(2) states that, with respect to the time limits on this exception,

> the standard of measurement is the duration of the state of excitement. "How long can excitement prevail? Obviously there are no pat answers and the character of the transaction or event will largely determine the significance of the time factor."

Evidence Rules Commentary at 230 (citations omitted).

> A: Well, the first thing is he told me he'd just been robbed and he had marked on his wrists where his wrists had been tied.

LaSage then related the circumstances of the robbery. The following question and answer appear immediately afterward:

> Q: Okay. Now what—in the course of getting the information you've described to us, did you interrogate Mr. O'Donnell or how was the information conveyed to you?
>
> A: Oh I didn't have to interrogate him. As soon as he opened the door after I knocked on it, he immediately proceeded to tell me what had occurred, that he'd just been robbed and basically just what I told you.

On cross-examination LaSage was asked whether or not he actually asked O'Donnell any questions. LaSage answered:

> Well, I asked him the—the particulars on like what drawers he searched, things like that. *But the basic he was robbed and this was taken and this is what the guy did, he gave to me. He just spit it right out as soon as I opened the door.* [Emphasis added.]

When asked if he could separate the information received through questioning from the information received before that, LaSage stated:

> Well, I can separate it to the point where he told me a story and then I had him go back over his story and put it in a chronological order in the events as they occurred, and then the items that were stolen, I had him repeat to me and made him sit down and think about the items that were stolen while I wrote them out on the stolen property list.

LaSage further testified that O'Donnell gave a physical description of his robber, but LaSage did not recall at what point in the interview this occurred.

This analysis is borne out by the federal cases decided under the parallel Federal Rule of Evidence 803(2). In *United States v. Golden,* 671 F.2d 369 (10th Cir.), *cert. denied,* 456 U.S. 919, 102 S.Ct. 1777, 72 L.Ed.2d 179 (1982), the declarant told his grandmother, after driving twelve miles to her house at 120 miles per hour, that he had just been hit over the head with a flashlight; the statement was found to be admissible as an excited utterance. In *United States v. Iron Shell,* 633 F.2d 77 (8th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981), police testimony about statements made by a nine-year-old girl concerning an attempted sexual assault that occurred between forty-five and seventy-five minutes earlier was held properly admitted. The court in *Iron Shell* stated that neither the lapse of time nor the fact that the statement was made in response to an inquiry was dispositive:

> Rather, these are factors which the trial court must weigh in determining whether the offered testimony is within the 803(2) exception. Other factors to consider include the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event and the subject matter of the statements. In order to find that 803(2) applies, it must appear that the declarant's condition at the time was such that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation.

633 F.2d at 86 (citations omitted).

■ The startling event in this case was the robbery. O'Donnell's initial statements, as related at trial by Officer LaSage, were spontaneous and concerned the startling event itself. They were made during O'Donnell's first contact with anyone besides the person who answered the telephone at the police station. O'Donnell apparently believed that Lipscomb had a gun and was prepared to use it if O'Donnell resisted. While O'Donnell was a mature adult, and the robbery did not involve unnecessary violence, the event taken as a whole (including the experience of being bound) could well have produced a state of excitement lasting until LaSage's arrival shortly thereafter.

The cases relied upon by Lipscomb are readily distinguishable because they involved events which, in context, were simply not sufficiently startling to generate the excitement for the period of time involved. *See, e.g., United States v. Knife,* 592 F.2d 472, 481 n. 10 (8th Cir.1979) (statements by defendant as to reasons for shooting by codefendant were improperly admitted where the purportedly exciting event was a pre-planned shooting); *United States v. Moss,* 544 F.2d 954, 958 (8th Cir. 1976), *cert. denied,* 429 U.S. 1077, 97 S.Ct. 822, 50 L.Ed.2d 797 (1977) (excited utterance exception not applicable to statement made by coconspirator several hours after bank robbery); *United States v. Narciso,* 446 F.Supp. 252, 287–88 (E.D.Mich.1977) (hospital patient was asked, two hours after his condition had stabilized, who gave him medicine prior to his cardiac arrest; the name he wrote on a slip of paper was improperly admitted because of ample time for reflection). We conclude that the statements made to LaSage immediately after his arrival were properly admitted as "excited utterances," under Evidence Rule 803(2).

■ By contrast, statements by O'Donnell about what was taken and the precise order of events during the robbery by their narrative nature, the fact that they were in response to police questioning, and that they were more remote in time from the robbery itself are more properly characterized as the product of reflective thought than excited utterances. This is especially true of O'Donnell's statements to Detective Nielsen, who arrived some thirty minutes after LaSage.

However, in the circumstances of this case, any error in admitting the later statements was harmless. The later statements

concern the details of what was taken and the precise chronology. Yet other evidence in this case clearly established that the items found in Lipscomb's possession were the ones from O'Donnell's apartment. In particular, Lipscomb's own statement to Nielsen on the audio tape referred to almost every item introduced by the state as having been "given" to him by O'Donnell.[8]

 As for Detective Nielsen's testimony, it contained only one actual reference to statements made by O'Donnell. This testimony involved O'Donnell's explanation of why he did not try to reach his gun. The element of fear[9] was clearly established by O'Donnell's initial explanation to LaSage. We therefore conclude that any errors in allowing this testimony by Detective Nielsen or in allowing the testimony by LaSage about statements made by O'Donnell in the second half of the interview were harmless.[10]

### D. Evidence and Instruction on Flight.

 The state was allowed to introduce, over defense objection, evidence that Lipscomb failed to appear for a hearing and fled the jurisdiction after being charged with the robbery. The state was also allowed to introduce evidence that when Lipscomb was asked for identification by Anchorage police in 1982, he refused, then gave a name different from the one he had given police in connection with the robbery in 1979. An Anchorage police officer also testified that Lipscomb was arrested for trespassing at that time and that all contacts Lipscomb had with Anchorage police during this period were under the name of Ronald Lipscomb. The trial court instructed the jury, again over objection, that flight may be considered as evidence of consciousness of guilt. The prosecutor argued that Lipscomb's actions demonstrated an awareness of guilt.

---

**8.** At least one piece of evidence found in Lipscomb's apartment was independently established to have been O'Donnell's. Terry Franklin, a friend of O'Donnell, testified that before the robbery he needed a place to hide some cash he had taken out of the bank. He went up to O'Donnell's apartment and put $5,000 into the back of the radio. When he returned from a trip, he found out O'Donnell had been robbed and that the radio had been taken. He immediately went to the police station and told them to look in the back of the radio found in Lipscomb's apartment. Inside the radio, police found the $5,000 in cash.

**9.** Former AS 11.15.240 provided:

A person who, by force or violence, or by putting in fear, steals and takes anything of value from the person of another is guilty of robbery, and is punishable by imprisonment in the penitentiary for not more than 15 years nor less than one year.

**10.** Lipscomb also argues that his right to confront the witnesses against him was violated by introduction of O'Donnell's statements. U.S. Const. amend. VI; Alaska Const. art. 1, § 11. The relationship between the hearsay rules and the confrontation clause is a close one: they are designed to protect very similar values. California v. Green, 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970). As a matter of federal constitutional law, the confrontation clause requires a showing that the hearsay declarant is unavailable as well as a showing that

the hearsay itself is "marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" Ohio v. Roberts, 448 U.S. 56, 65, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 607 (1980), quoting Snyder v. Massachusetts, 291 U.S. 97, 107, 54 S.Ct. 330, 78 L.Ed. 674 (1934). The Court in Roberts set forth the following rule regarding the requisite "indicia of reliability":

Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

448 U.S. at 66 (footnote omitted). See also Hawley v. State, 614 P.2d 1349, 1358–59 (Alaska 1980) (adopting four-factor list for evaluating reliability from United States v. Snow, 521 F.2d 730, 734–36 (9th Cir.1975), cert. denied, 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976)). We hold that the trustworthiness of all the statements made by O'Donnell and admitted through the testimony of LaSage and Nielsen was established either by the fact that they fell within the recognized hearsay exception for excited utterances or by "particularized guarantees," including the strong corroborative evidence (e.g., ligature marks on O'Donnell's wrists, disarray of the apartment). Therefore, the confrontation clauses of the state and federal constitutions were not violated.

Lipscomb argues on appeal that the court's actions constituted an abuse of discretion and prejudicial error. We find no error in either the admission of the evidence or the instruction.

In *Dyer v. State*, 666 P.2d 438 (Alaska App.1983), we rejected a similar argument. Dyer claimed he shot his victim in self-defense. We held that evidence that Dyer fled the scene immediately, assumed a false name on at least one occasion, and deliberately avoided all contact with police for nearly sixteen months was properly admitted. *Id.* at 449. *Cf. Elson v. State*, 659 P.2d 1195, 1201 n. 21, 1202 n. 23 (Alaska 1983) (while court expressed serious doubts about the relevancy of evidence of flight to the issue of guilt, it noted that, after considering whether the evidence is relevant, appellate courts should then assess and balance the probability of unfair prejudice); A.R.E. 403.

We believe that the evidence of flight in this case may even have been more probative of consciousness of guilt than the evidence in Dyer's case, since flight from the scene of a shooting is more likely to be the product of an irrational fear than is flight two months after arrest. The fact that Lipscomb used an alias at some time after the robbery also tends to establish consciousness of guilt. E. Cleary, *McCormick on Evidence*, § 271 at 655 (2d ed. 1972). Moreover, the challenged testimony of the Anchorage officer and Detective Nielsen was reasonably necessary to explain to the jury why the robbery charge was being tried three years after the fact. As in *Dyer*, we conclude that the court did not abuse its discretion in concluding that the

probative value of this evidence outweighed any prejudicial effect. The jury instruction we upheld in *Dyer* is very similar to that given in this case.[11] We hold that Judge Taylor did not err in his treatment of the evidence of flight.

### E. *Pre-accusation delay on failure to appear.*

Lipscomb failed to appear at a hearing set for November 2, 1979. A bench warrant was issued. The Alaska State Troopers' Judicial Services branch would normally enter such a warrant into the national computer systems. This warrant was not entered. Detective Nielsen made several unsuccessful inquiries as to Lipscomb's whereabouts. It appears that Lipscomb left the state sometime in October 1979. Between 1980 and 1982, he was incarcerated in various states under the name Ronald Lee Lipscomb. After his return to Alaska, Lipscomb was convicted of several misdemeanors under the same name. Finally, on December 6, 1982, when Lipscomb was arrested for trespassing in Anchorage, a warrant check turned up a Fairbanks bench warrant on a James Lipscomb with the same birth date and of similar description. Police found in Lipscomb's billfold a social security card in the name of James Lipscomb. Eight days later, he was indicted for failure to appear.

Lipscomb contends that the three-year delay between the conduct and the indictment violated due process.[12] *See Marks v. State*, 496 P.2d 66, 68 (Alaska 1972). The relevant inquiries are the reasonableness of the delay and the degree of

---

11. The instruction in this case was as follows: If you find that the defendant fled the jurisdiction and/or sought to avoid apprehension for the offense with which he is charged, that is not enough alone to convict him. You may, however, consider that fact or facts, if found, along with other evidence in determining his guilt or innocence.
 The court in *Dyer* instructed the jury:
 The flight of a person immediately after the commission of a crime is not sufficient in

itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such evidence is entitled is a matter for the jury to determine.
 666 P.2d at 449.

12. U.S. Const. amend. XIV, § 1; Alaska Const. art. I § 7.

prejudice resulting from the delay. *Id.* In ruling on the motion to dismiss, Judge Taylor concluded that Fairbanks police never knew Lipscomb's whereabouts during this period. Lipscomb argues that police would have learned of his whereabouts as soon as Lipscomb was arrested if the bench warrant had been entered into the computer. We note that, since Lipscomb was incarcerated under a name different from the one on the warrant, this was not necessarily the case. Under the circumstances of this case, the decision not to charge Lipscomb with failure to appear until he was located and in custody seems to us a reasonable one. We therefore need not consider the degree or nature of any prejudice suffered by Lipscomb as a result of the delay. We hold that Lipscomb's due process rights were not violated.

### F. *Sentence.*

■ Lipscomb contends that Superior Court Judge Warren Taylor failed to consider the *Chaney* criteria in this case and that the sentence imposed is excessive. *See State v. Chaney*, 477 P.2d 441 (Alaska 1970). The maximum sentence for robbery in 1979 was fifteen years. Former AS 11.15.240. Judge Taylor imposed a sentence of fifteen years with five suspended for the robbery. No restrictions were placed on parole.

Lipscomb argues, and the state concedes, that his conduct would render him guilty only of second-degree robbery (a class B felony) under the Revised Code. AS 11.41.-510. The state's concession is not well-founded. Lipscomb told O'Donnell that he had a gun. This representation that he was armed with a deadly weapon would render Lipscomb's conduct robbery in the first degree, a class A felony. AS 11.41.-500. For this conduct, Lipscomb would be subject to a maximum sentence of twenty years. We therefore reject Lipscomb's argument that his sentence violates *Sundberg v. State*, 652 P.2d 113 (Alaska App. 1982). In *Sundberg*, we held that, "while not binding on the trial court, the new code does give an indication of current legislative intent and, absent factors in a specific case warranting a harsher sentence, the defendant should be sentenced within the range of sentences provided by the new code." *Id.* at 116. Lipscomb's sentence is well within "the range of sentences provided by the new code" for the conduct of which he was convicted.

Although the state has not argued any particular aggravating factors that would have been applicable had Lipscomb been subject to presumptive sentencing, we believe that Lipscomb's criminal history [13] and the poor prognosis for his rehabilitation documented in the presentence report make him a dangerous offender. *Graybill v. State*, 695 P.2d 725, 730 (Alaska, 1985); *Sundberg v. State*, 652 P.2d at 116. We note that, because of prior offenses, Lipscomb might have been subject to a presumptive term of ten or fifteen years if his conduct had been governed by the Revised Code. AS 12.55.125(c). *See Sundberg*, 652 P.2d at 116.

■ While the sentencing court is free to reject the conclusions reached in the presentence report, Judge Taylor clearly did not do so. He referred to the fact that Lipscomb's offenses have been successively more serious and stated that Lipscomb was "almost in the area of becoming a

---

**13.** Lipscomb's criminal record before he came to Alaska can be summarized as follows:

| 1971 | possession of narcotics |
| 1975 | credit card abuse |
| 1976 | assault |
| 1978 | burglary of a building |

The assault case was originally charged as aggravated robbery. In addition to these offenses, Lipscomb was convicted of disorderly conduct, abusive conduct, resisting arrest, auto theft, and four other charges of credit card abuse during this period. When Lipscomb committed the instant offense, he was wanted in Texas for violation of his parole conditions. Between July and September 1982, after he returned to Alaska, Lipscomb was convicted of malicious destruction of property, assault and battery on a police officer, trespass, concealment of merchandise, shoplifting, and assault and battery.

habitual offender." The court also noted that Lipscomb has not been deterred from committing crimes despite having served substantial time on several offenses and that while Lipscomb's criminal conduct is clearly related to substance abuse he had apparently never "availed himself of treatment possibilities in the past." Lipscomb's prior convictions and the amount of time he has previously served in prison clearly support the court's finding and qualify Lipscomb as a dangerous offender. *See Viveros v. State,* 633 P.2d 289, 291 (Alaska App.1981) (noting that Revised ABA Standards define "dangerous or habitual offender" as one who has previously been convicted of two felonies and served at least one year of imprisonment). We conclude that Judge Taylor adequately addressed the *Chaney* criteria, even though he did not recite them verbatim. *See Evans v. State,* 574 P.2d 24, 26 (Alaska 1978).

Although this was Lipscomb's first major offense involving force against a person, the danger inherent in this particular offense was not, as Lipscomb argues, minimal. O'Donnell believed that Lipscomb had a gun, precisely the sort of danger that has led the legislature to create relatively harsh penalties for theft committed by force or threat of force. We believe that the circumstances of the offense, when combined with Lipscomb's dangerousness, justify a sentence of fifteen years with five suspended. The sentence was not clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

Lipscomb's convictions and sentence are AFFIRMED.