STATE of Alaska, Petitioner,

v.

Andrew GONZALES, Respondent.

No. S–12103.

Supreme Court of Alaska.

April 20, 2007.

Diane L. Wendlandt, Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Petitioner.

Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Respondent.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

CARPENETI, Justice.

## I. INTRODUCTION

In 1992 Andrew Gonzales was accused of sexually abusing the ten-year old daughter of his girlfriend. Following the accusation Gonzales fled the state and the child required extensive psychiatric hospitalization. Gonzales did not resurface for ten years, at which point the state presented his case to a grand jury, which indicted Gonzales. The superior court dismissed the case against Gonzales after finding that the ten-year pre-indictment delay was not reasonable and had resulted in actual prejudice. The court of appeals upheld this dismissal. We reverse because Gonzales's flight in combination with the child's mental health needs justified the pre-indictment delay. We remand to the superior court for further proceedings including a determination of whether remedial sanctions are appropriate due to prejudice from lost evidence, and if so, what those sanctions should be.

## II. FACTS AND PROCEEDINGS

### A. Facts

On January 5, 1992 a state trooper stopped Andrew Gonzales for a traffic violation while his girlfriend, D.D., and her ten-year old daughter, A.D., were passengers in the car.[1] The trooper noticed sexually explicit drawings inside the car which depicted a young girl. Later that day the trooper conducted a taped interview of A.D. and D.D., investigating whether A.D. was the girl depicted in the drawings and whether Gonzales had sexually abused A.D.

In that initial interview, A.D. denied that Gonzales had ever seen her naked, touched her private parts, or asked her to keep secrets. D.D. similarly indicated that she had never seen or heard anything that would lead her to believe anything was "going on" between A.D. and Gonzales.

By mid-January the case had been transferred to the Anchorage Police Department and assigned to Detective Linda Branchflower. On January 15, Detective Branchflower interviewed A.D. alone. In that interview A.D. reported that Gonzales had sexually abused her. Detective Branchflower arranged for A.D. to come to the station where the detective recorded an additional interview with A.D. During the in-station interview with Detective Branchflower, A.D. stated that Gonzales had touched her genitals and touched her with his penis. A.D. also explained that she did not tell anyone about the abuse because Gonzales had threatened to hurt her.

The next day the police executed a search warrant on Gonzales's home, removing, among other things, drawings and children's clothing catalogs. The following day, January 17, Detective Branchflower interviewed Gonzales. According to the police report of the interview, Gonzales admitted that the drawings found by the troopers were of A.D. but stated that A.D. had not posed for them. When asked directly about the allegations of sexual abuse, Gonzales invoked his right to counsel and ended the interview. Detective Branchflower did not arrest Gonzales or instruct him to remain in the state. Following the interview, the police executed a second search warrant on Gonzales's home, retrieving a tape they had missed during the first search the previous day.

Gonzales left the state shortly after being questioned by Detective Branchflower. He did not inform his fifteen-year old son—who was living with him and dependent on him—that he was leaving or where he was going. Indeed, Gonzales left between the time his son went to bed one night and awoke the next day. Gonzales did not notify his landlord or shut off his utilities. He did not leave a forwarding address. And he did not inform the police about his move.

Meanwhile the police responded to a call from D.D. in late January reporting A.D.'s upset and aggressive behavior. D.D. stated that she had to hold down A.D. to prevent the girl from hurting herself or her younger brother, and that A.D. later got into a water-filled bathtub while fully clothed. Detective Branchflower, learning about this report from the responding officer, contacted D.D.

---

1. Gonzales is not related to A.D.

and suggested that A.D. receive immediate psychiatric care. A.D. spent much of the next six months in residential treatment at the Charter North facility, and continued to receive treatment afterwards. A.D.'s final Charter North hospitalization lasted twenty-one days during January 1996.

Over the weeks and months following the accusation Detective Branchflower attempted to locate Gonzales by searching databases that would show whether Gonzales had applied for a driver's license or had committed a crime in Florida, Nevada, or Washington—all states where she thought Gonzales might be residing. Detective Branchflower suspended the investigation in July 1992, noting "[i]nvestigative leads have been exhausted. Suspects whereabouts are unknown. Victim has significant psychiatric trauma due to the sexual abuse." The investigation remained suspended for several years although occasionally Detective Branchflower checked to see if Gonzales had resurfaced.

Gonzales returned to Alaska in December 2001. Detective Kristie Neddeau of the Anchorage Police Department resumed the investigation when she learned of Gonzales's whereabouts in Alaska from a concerned neighbor claiming that Gonzales was "grooming" a child in the neighborhood for possible sexual abuse. Neddeau obtained a search warrant to search Gonzales's home for child pornography, and officers found thousands of images of child pornography.

### B. Proceedings

In September 2002 a grand jury indicted Gonzales for four counts of first degree sexual abuse of a minor,[2] two counts of second degree sexual abuse of a minor,[3] and one count of attempted first degree sexual abuse of a minor,[4] all stemming from A.D.'s 1992 allegations. The grand jury also indicted Gonzales on three counts of distribution of child pornography and seven counts of possession of child pornography based upon his

conduct in 2002. These latter counts are not on appeal before us.

Gonzales moved to dismiss the sexual abuse of a minor charges on the basis of prejudicial pre-accusation delay. By the time the indictment was returned, the state had lost all tape recordings of the interviews conducted by the state troopers and Detective Branchflower in 1992 except for the initial interview of A.D. in which she denied the abuse. The state also lost what Gonzales alleges to be a videotaped version of the interview in which A.D. accused Gonzales. The state has preserved transcripts of all the interviews known to be recorded, with the exception of Detective Branchflower's January 17, 1992 interview of Gonzales.

The superior court conducted a series of evidentiary hearings in which Gonzales, Gonzales's son, and Detective Branchflower testified. The superior court issued a written order granting Gonzales's motion to dismiss the 1992-based charges on the basis of pre-accusation delay. The superior court stated on the record:

> [T]here was no good reason set forth for the delay. I'm going to find also that because the tapes were missing, among[ ] other items of evidence . . . that I would have granted the motion under *Fletcher [v. Anchorage]*[5] to give an instruction to the jury that they would have presumed that the evidence would have been favorable to the defendant. In my view that sort of finding . . . is equivalent to actual prejudice.

The state appealed the ruling to the court of appeals which affirmed the superior court.[6] The court of appeals held that "the State presented no evidence justifying the delay." [7] The court of appeals also characterized the issue before the superior court as being "whether due process was violated when the state unreasonably delayed indictment, thereby prejudicing Gonzales's ability

---

**2.** AS 11.41.434(a)(1).

**3.** AS 11.41.436(a)(2).

**4.** AS 11.41.434(a)(1) & AS 11.31.100.

**5.** 650 P.2d 417, 418 (Alaska App.1982).

**6.** *State v. Gonzales,* 121 P.3d 822 (Alaska App. 2005).

**7.** *Id.* at 826.

to present a defense."[8] In such a circumstance the court of appeals stated that no lesser sanction than dismissal was supported by case law.[9]

## III. STANDARD OF REVIEW

 An appellate court reviews a trial court's dismissal of an indictment for an abuse of discretion.[10] We will not overturn a decision left to the discretion of the trial court "[a]bsent a definite and firm conviction that the judge made a mistake."[11]

 We review *de novo* the question of which party holds the burden of proof in a motion,[12] as well as all other questions of law. In ruling on questions of law we "adopt the rule that is most persuasive in light of precedent, reason, and policy."[13]

## IV. DISCUSSION

### A. The Pre–Accusation Delay Test Places the Burden of Proof on the Defendant.

 A defendant's pre-accusation or pre-indictment rights are entitled to limited protection under the federal and Alaska Constitutions.[14] The right to a speedy trial is not implicated at all in such a case because that right attaches only upon either formal charges or arrest,[15] when the defendant experiences a restraint on his liberty or suffers the "public obloquy" that accompanies formal charges.[16] Instead, an individual's primary safeguard against undue pre-indictment delay is the statute of limitations set by the legislature.[17] "Such statutes represent legislative assessments of relative interests of the State and the defendant in administering and receiving justice."[18] Gonzales does not dispute that his indictment fell within the statute of limitations. The remaining safeguard against stale indictments is provided by the due process clauses of both the Alaska and federal constitutions.[19]

 State due process challenges are analyzed under a two-part test which aims to "protect[ ] the accused from improper or unreasonable conduct by the government in the bringing of a criminal charge."[20] The first part of the test inquires whether the delay was reasonable.[21] The second part examines "the degree of prejudice resulting from the delay."[22] To establish an unconstitutional pre-indictment delay, the defendant must prove both that the delay was not reasonable[23] and that the defendant suffered actual prejudice from the delay.[24] If the defendant succeeds in meeting both parts of the test,

8. *Id.* at 828.

9. *Id.*

10. *Sheldon v. State*, 796 P.2d 831, 834 (Alaska App.1990).

11. *City of Kenai v. Ferguson*, 732 P.2d 184, 190 (Alaska 1987).

12. *Flynn v. E.I. du Pont de Nemours & Co.*, 988 P.2d 97, 98 (Alaska 1999).

13. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

14. *See State v. Mouser*, 806 P.2d 330, 336 (Alaska App.1991).

15. *United States v. Lovasco*, 431 U.S. 783, 788–89, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Marion*, 404 U.S. 307, 320–21, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Burke v. State*, 624 P.2d 1240, 1242–43 n. 1 (Alaska 1980); *Yarbor v. State*, 546 P.2d 564, 567 (Alaska 1976).

16. *Marion*, 404 U.S. at 320, 92 S.Ct. 455.

17. *Marks v. State*, 496 P.2d 66, 68 (Alaska 1972).

18. *Marion*, 404 U.S. at 322, 92 S.Ct. 455.

19. U.S. Const. amend. XIV; Alaska Const. art. I, § 7; *Lovasco*, 431 U.S. at 789, 97 S.Ct. 2044; *Burke*, 624 P.2d at 1242; *Coffey v. State*, 585 P.2d 514, 519 (Alaska 1978).

20. *State v. Mouser*, 806 P.2d 330, 336 (Alaska App.1991).

21. *Lipscomb v. State*, 700 P.2d 1298, 1309–10 (Alaska App.1985).

22. *Id.*

23. The state argues that we should explicitly adopt the prevailing standard in most federal jurisdictions: a presumption that the state is acting reasonably in cases of delay unless the defendant can show that the state is acting in bad faith. We decline to adopt that approach at this time.

24. *Mouser*, 806 P.2d at 336.

the only sanction is dismissal.[25]

Alaska case law requires that "the defendant bears the burden of proof" to demonstrate "the absence of a valid reason for the delay."[26] However, once the issue of pre-indictment delay is raised, the state has the burden "to come forward with reasons for the delay."[27] This intermediate burden is necessary because the reasons for the delay are "normally within the exclusive knowledge of the state."[28] When the reasons are advanced, "the defendant must show that they do not justify the delay."[29] The defendant also has the burden to prove actual prejudice.[30]

In this case the lower courts did not properly assign the burden of proof to the defendant, instead placing the burden on the state not only to proffer reasons for the delay but also to justify why the delay was necessary. For example, the superior court asked, "Wouldn't [Gonzales's fleeing the state] cut towards ... let's indict him now in 1992[?] ... I mean if that's when he fled, under those circumstances, why wait?" In response to the state's argument that Gonzales's flight was a reasonable reason for the state to delay the superior court remarked, "I don't think [Gonzales's flight] has anything to do with anything ... and Detective Branchflower said as much. She *could* have brought the charge." (Emphasis added.) Later the superior court commented, "I mean why didn't you go to a grand jury? I just, quite frankly, still don't understand. And so I think that's the real problem and I don't know the answer to it."

The court of appeals's opinion characterizes the evidence in a way that likewise indicates that the state failed to meet its burden.

The court summarized the factual conclusions that the superior court could reasonably have come to and concluded, "the State presented no evidence justifying the delay."[31]

In combination these statements indicate that the burden of proof was misapplied in the lower courts. When the facts of this case are reexamined under the proper burdens, we are compelled to reverse.

**B. The Lower Courts Erred in Finding that the Ten–Year Delay in Gonzales's Indictment Was Unreasonable.**

**1. The delay in indicting Gonzales is presumptively valid because of his flight from the state and because of concerns about the welfare of A.D.**

The record indicates that the state offered two persuasive reasons for the ten-year delay between the 1992 allegations of child molestation and the 2002 indictment. First, Gonzales fled the state and could not be located until 2002. Second, A.D. was institutionalized for a significant period of time subsequent to the alleged abuse.[32] After these reasons were proffered, the lower courts should have shifted the burden to Gonzales to show that his flight and concerns about A.D. were not reasonable reasons to delay prosecution. Both of the reasons the state mentions—Gonzales's absence from the state and concerns about the minor—have been found, in isolation, to justify delay. We consider each reason in turn.

**(a) A defendant's flight is a reasonable reason for the state to delay an indictment.**

Alaska cases support the state's proposition that a defendant's flight is a rea-

**25.** *Alexander v. State*, 611 P.2d 469, 475 (Alaska 1980) ("[Remand to determine pre-accusation delay] will either result in a dismissal of the conviction or a finding of no pre-indictment delay.").

**26.** *Coffey v. State*, 585 P.2d 514, 519–20 (Alaska 1978).

**27.** *Mouser*, 806 P.2d at 336 (quoting *York v. State*, 757 P.2d 68, 71 (Alaska App.1988)).

**28.** *Coffey*, 585 P.2d at 520 n. 19.

**29.** *Mouser*, 806 P.2d at 336.

**30.** *Id.*

**31.** *State v. Gonzales*, 121 P.3d 822, 826 (Alaska App.2005).

**32.** The state at times argued a third reason—that the state was waiting for better evidence to materialize. This reason has the least support from the record, and we join the court of appeals in addressing these concerns in the context of A.D.'s emotional state.

sonable cause for the state to delay an indictment. In *Lipscomb v. State*,[33] the court of appeals held that Lipscomb's due process rights were not violated by a three-year delay between his conduct of failing to appear for a hearing and his indictment on the charge because Lipscomb left the state and operated under an assumed name in the intervening time.[34] A bench warrant was issued in Lipscomb's name but not entered into the national computer systems as was normal practice.[35] A detective did make several unsuccessful inquiries into Lipscomb's whereabouts. Lipscomb claimed that the police could have known about his whereabouts if they had entered his warrant into the computer system, but we noted that because Lipscomb was arrested under false names elsewhere, "this was 'not necessarily the case.' "[36]

Gonzales argues that his situation is distinguished from *Lipscomb* in several ways. First, Gonzales argues that Lipscomb "truly fled" because at the time he left the state he had already been indicted for robbery (indeed, Lipscomb failed to appear at a pretrial hearing, leading to the pre-indictment delay in charging him with failure to appear).[37] In contrast, Gonzales argues that "there was nothing to indicate to Gonzales that he should or was required to remain in Alaska." We reject that argument. Gonzales was aware of the ongoing investigation and believed that he needed a lawyer. Because Gonzales delayed the state's investigation, the case had not yet reached the point of arrest or indictment. That he had not yet been indicted does not make Gonzales's departure any less a flight.

The record also offers a plethora of reasons to characterize Gonzales's departure as a flight: he left home in the middle of the night, having "never [been] so scared in [his] life," without knowing where he was going, and without informing his minor son.[38] He failed to notify his landlord or shut off utilities. And he subsequently misled his girlfriend D.D. as to his whereabouts by sending a note suggesting that he was looking for work in Seattle.

Gonzales also attempts to distinguish himself from *Lipscomb* on the issues of false identity and thoroughness of the police search. Gonzales maintains that he never changed his identity, unlike the defendant in *Lipscomb*, and that the police failed to follow up on leads that would have taken them to him. Specifically, Detective Branchflower had been told that Gonzales might be in Las Vegas with his uncle Jack Carother (where Gonzales lived for some months before moving elsewhere in the city). Detective Branchflower did not contact the Las Vegas police with Gonzales's suspected location at the uncle's home. Nonetheless it seems that Gonzales worked to conceal his location. As the state points out, Detective Branchflower was in fact told that Gonzales had left Alaska *a week earlier* and was staying with his uncle for *only a few days*, meaning that Gonzales would have already moved on by the time Detective Branchflower learned of the tip had the information been accurate. This was apparently confirmed by Gonzales's subsequent false message to D.D. that he was living in Seattle. The state also points out that Gonzales moved several times in his ten-year absence and that he often was self-employed or living with friends, making him more difficult to trace.

Gonzales cites *Odekirk v. State*[39] for the proposition that the state should have done more investigative work in order for a delay predicated on his absence to be reasonable. *Odekirk* presented the question of whether or not Criminal Rule 45[40] barred a defendant's conviction. In order to make that

---

**33.** 700 P.2d 1298 (Alaska App.1985).

**34.** *Id.* at 1309–10.

**35.** *Id.*

**36.** *Id.*

**37.** *Id.*

**38.** As a result his son became a ward of the state, living in a state home and foster homes.

**39.** 648 P.2d 1039 (Alaska App.1982).

**40.** Alaska R.Crim. P. 45 sets out speedy trial guidelines, which are not directly applicable to Gonzales because his right to a speedy trial had not attached at the pre-indictment stage.

determination the court needed to decide whether to exclude the period of Odekirk's absence from the state from the speedy trial time limits. The law provided that a defendant was considered absent (and thus the time did not run against the state) "whenever his whereabouts are unknown and in addition he is attempting to avoid apprehension or prosecution or his whereabouts cannot be determined by due diligence." [41] *Odekirk* established that "a failure to exhaust every conceivable method of locating a defendant will not establish a lack of due diligence so long as the state, employing customary methods, continues to actively seek a defendant." [42] However, in *Odekirk* the court found that the state did not exercise due diligence when no effort was made to trace Odekirk through the military or to discover where it sent his personal effects, particularly given that Odekirk's commanding officer had called the police to warn of Odekirk's pending discharge. [43]

*Odekirk* is distinguishable on several grounds, including that Criminal Rule 45 does not apply to pre-indictment delay. [44] Moreover, the tip that Gonzales was in Las Vegas with his uncle was not entitled to the same weight as the evidence overlooked in *Odekirk*. This is particularly true because Detective Branchflower received multiple conflicting reports as to Gonzales's whereabouts. In addition, the circumstances of Gonzales's departure are significantly more incriminating than those in *Odekirk*. Odekirk's departure came after the initial charges brought against him had been dismissed, when it was uncertain whether more charges were to come, and when his military service was up. [45] Gonzales had no similar reason to expect that his investigation was going to be dismissed, and his actions in leaving suddenly in the middle of the night are much more consistent with flight.

■ Finally, Gonzales argues that the length of delay in his case exacerbates any ordinary concerns of pre-indictment delay including faded memories and difficulties in locating witnesses, making an otherwise reasonable delay unreasonable. Our case law has not emphasized the length of pre-accusation delay. As the court of appeals stated here, "The primary concern of the rule against unreasonable pre-accusation delay is not the length of the delay, but the harm to the defendant's ability to present a defense." [46] Nonetheless, in *Mouser* that proposition was used to explain that even a relatively short pre-accusation delay could violate a defendant's rights, [47] and no case that has come before us has approached the length of the delay at issue here. [48] We have emphasized the continuing nature of the investigations during periods of delay and have cautioned that "continued or long term inactivity or a pattern of lack of prompt investigation of cases might warrant our reconsideration of such periods." [49] However, because the delay here was caused largely by the actions of the defendant, the ten-year delay was nonetheless reasonable.

In sum, the state presented a valid reason for delay, and the defendant did not ade-

41. *Odekirk*, 648 P.2d at 1040 n. 1 (quoting Alaska R.Crim. P. 45).

42. *Id.* at 1043.

43. *Id.*

44. *See Yarbor v. State*, 546 P.2d at 567 (Alaska 1976) (right to speedy trial does not attach until defendant formally accused).

45. *Odekirk*, 648 P.2d at 1043–44.

46. *Gonzales*, 121 P.3d at 825 (citing *State v. Mouser*, 806 P.2d 330, 336 (Alaska App.1991)).

47. *Mouser*, 806 P.2d at 336.

48. *See Burke v. State*, 624 P.2d 1240 (Alaska 1980) (five-month delay); *Alexander v. State*, 611 P.2d 469 (Alaska 1980) (ninety-one days); *Prenesti v. State*, 594 P.2d 63 (Alaska 1979) (eight months); *Coffey v. State*, 585 P.2d 514 (Alaska 1978) (four months); *Yarbor*, 546 P.2d 564 (seven months); *P.H. v. State*, 504 P.2d 837 (Alaska 1972) (seven and one-half months); *Marks v. State*, 496 P.2d 66 (Alaska 1972) (eight months); *McKay v. State*, 489 P.2d 145 (Alaska 1971) (two and one-half months). *See also United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977) (eighteen months); *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (over three years); *Lipscomb v. State*, 700 P.2d 1298 (Alaska App.1985) (three years).

49. *Burke*, 624 P.2d at 1245.

quately rebut that presumption of reasonableness.

### (b) Concerns about the welfare of A.D. justify delay.

In *Yarbor v. State*,[50] we held that a seven-month pre-indictment delay did not violate the defendant's due process rights because it was not unreasonable for the state to wait three months for the mother of a sexual abuse victim to decide whether or not to press charges. Yarbor performed lewd and lascivious acts towards a ten-year old child in August 1973. Between August and December of that year the district attorney's office reviewed the case, and in December a formal complaint was prepared for the minor's mother to sign.[51] The mother was notified several times a month that the complaint was ready for her signature, but she did not sign until March of that next year.[52] Two days later, Yarbor was served with the complaint.[53] This court found that the state's decision to wait three months because of the mother's hesitation was not unreasonable.[54] The court noted that the "emotional effects to the child, injury to the child's reputation, and family disruption[ ] all had to be considered in [the mother's] decision." [55]

In *Burke v. State*,[56] we expanded on the justifiability of delay in cases involving sexual abuse of a minor. In that case the accused was charged with statutory rape against his stepdaughter. We explained that "[a]lthough the mother in this case was not reluctant, a concern by the district attorney's office over the advisability of bringing charges of a similarly serious nature also suggests that the effects on the victim and her family are factors which must be carefully weighed by the district attorney." [57]

Case law thus shows that consideration for the victim's situation is an acceptable reason for pre-indictment delay. Indeed, it is possible that the investigators had even more reason for the delay in the present case because A.D. necessitated such extensive psychiatric hospitalization allegedly due to her trauma. Furthermore, *Burke* and *Yarbor* each presented a case in which any testimony from the victims could be put to immediate use because the whereabouts of the perpetrator was known. In contrast, Detective Branchflower could reasonably hesitate even longer before bringing A.D. in front of a grand jury given that Gonzales could not be found.

The superior court acknowledged that further testimony would have been necessary from A.D. for the grand jury to indict Gonzales, but faulted the state for not presenting evidence that A.D. was unable to have testified in 1992 (presumably following her release from the hospital). The superior court stated on the record, "this is a case that was ready to go and it didn't go, and problems have resulted." We disagree with that characterization. Given A.D.'s emotional fragility and the defendant's absence from the state, the state acted reasonably by delaying. By the time that A.D. was released from the hospital, Gonzalez had fled. The superior court abused its discretion in determining that the state's decision to delay was unreasonable.

### C. Determinations of Prejudice Should Be Made by the Superior Court on Remand.

Because we hold that the pre-indictment delay was reasonable, the defendant cannot succeed in establishing both prongs of the pre-indictment delay test and therefore the indictment may not be dismissed because of pre-indictment delay. But a question remains as to what, if anything, should be done on account of the lost tape recordings. Gonzales argues that he has been prejudiced because the state lost the tapes to eleven interviews related to the charges against

**50.** 546 P.2d 564, 567 (Alaska 1976).

**51.** *Id.* at 565.

**52.** *Id.* at 565–66.

**53.** *Id.* at 566.

**54.** *Id.* at 567.

**55.** *Id.*

**56.** 624 P.2d 1240 (Alaska 1980).

**57.** *Id.* at 1246.

him. Two of these tapes, Gonzales claims, "are crucial to a jury's determination of credibility." Of these eleven interviews, Gonzales has transcripts of every one except his own interview with Detective Branchflower which took place on January 17, 1992. This is one of the interviews that Gonzales describes as "crucial," and the state concedes that there was a tape to the interview that has since been lost. The other such tape is Detective Branchflower's in-station interview of A.D. in which A.D. first makes the accusations. Gonzales states that this is a video-recorded interview, as were the other interviews conducted that day of M.D. (A.D.'s brother) and D.D.[58]

It is unclear that the interview was recorded with a video recorder, as Detective Branchflower's police report notes suggest, as Gonzalez asserts, and as the state seems to concede.[59] Remarks in the transcript of the interviews indicate that the interview was an audio recording, not video. At one point Detective Branchflower instructed A.D. "You have to say yes or no because my tape recorder can hear you pretty good but can't see you when you shake your head, OK?" At another point Detective Branchflower told A.D. "You're gonna have to talk real big for my tape recorder." Finally, when Detective Branchflower asks A.D. whether or not Gonzales owned a video camera, instead of pointing to the one that Gonzales asserts was in the room to give an example, Detective

Branchflower said, "Does he have a video camera? Do you know what a video camera is? Something that can take a movie of you?" The transcripts show a similar likelihood that audiotape was used to interview M.D. later that same afternoon.[60] This is important because one of Gonzales's most compelling arguments was that the videotape would supply information about body language and subtle cues as well as showing what A.D. did with the anatomical dolls she was using to describe the assault. Accordingly, on remand the superior court should determine whether the interview was recorded with a video or audio recorder.

The superior court addressed this missing evidence in the context of determining actual prejudice under the second prong of the test for pre-indictment delay. It found that: "because the tapes were missing, among[ ] other items of evidence ... I would have granted the motion under *Fletcher [v. Anchorage]*[61] to give an instruction to the jury that they would have presumed that the evidence would have been favorable to the defendant. In my view that sort of finding ... is equivalent to actual prejudice." [62] This conclusion conflates two different standards and misunderstands the role of a *Fletcher* instruction.

■■■ In *Fletcher* the court of appeals provided guidance to courts regarding whether and how to apply sanctions when evidence

**58.** In Gonzales's initial "Memorandum in Support of Motion to Dismiss Indictment" dated December 18, 2002, Gonzales separately identifies a videotaped interview with A.D., M.D. and D.D. from January 15, 1992 from the taped interviews dated January 17, 1992 on the transcripts, suggesting two rounds of interviews with A.D. and M.D. in the police station two days apart. Detective Branchflower's testimony and the content of the interview transcripts reveal that the transcripts were mislabeled as January 17th when the interview in fact occurred on January 15th. The state made this point in "State's Opposition to Gonzales' Motion to Dismiss" before the superior court. Gonzales seems to concede the issue in his "Supplemental Briefing: Motion to Dismiss" where, following a hearing that included testimony from Detective Branchflower, he argues that Detective Branchflower did not "even attempt[ ] to re-interview A.D." following the January 15th interview. Finally, from his citation in his brief, it is clear that Gonzales considers the interview transcribed in the ex-

cerpt 90–96 to be part of the videotaped interview of January 15th.

**59.** The state argued to the court in its supplemental briefing on the motion to dismiss that "The video tape defendant refers to is that of A.D. While the video tape was lost, the audio tape was transcribed and produced to defendant."

**60.** Detective Branchflower similarly instructed M.D. as if there was an audio recorder only. Detective Branchflower said to M.D., "Ok. You're shaking your head no. You know what, my tape recorder's got real good ears but it can't see you when you shake your head so you have to say yes or no."

**61.** 650 P.2d 417, 418 (Alaska App.1982).

**62.** Quoted in *State v. Gonzales*, 121 P.3d 822, 824 (Alaska App.2005).

has been lost in preparation for a case.[63] Under *Fletcher*, the imposition of sanctions and what sanctions should be applied "is to be determined by weighing the degree of culpability involved on the part of the state, the importance of the evidence which has been lost, and the evidence of guilt which is adduced at trial.... [W]here it appears that the evidence was lost or destroyed in good faith, the imposition of sanctions will depend on the degree to which the defendant has been prejudiced."[64] *Fletcher* also stated a policy that "[t]he remedy of dismissal is a severe sanction which is generally not justified unless there has been deliberate action by the government or significant prejudice to the defendant."[65]

 Almost by definition, *Fletcher* asks a different question than prong two of the test for prejudicial pre-indictment delay.[66] On the one hand, the second prong of the pre-indictment delay test recognizes that, because the state ordinarily owes the accused no duty to indict promptly, unjustified delay by itself (that is, absent a showing of prejudice), cannot raise due process concerns. The second prong thus requires the accused to shoulder the further burden of proving that the state's unreasonable delay actually caused serious prejudice—that is, prejudice exposing the accused to an intolerable risk of being unfairly convicted. On the other hand, the *Fletcher* test recognizes that the state has a due process duty to preserve physical evidence. Thus, when the state breaches this duty, *Fletcher* requires the prosecution to bear the burden of proving that the failure to preserve the evidence was in good faith and that the defendant has not suffered prejudice.[67] Unlike the pre-indictment delay test, which mandates dismissal if the criteria are met, the *Fletcher* test leaves the trial court with the discretion to apply a wide array of remedies to cure any prejudice re-

sulting from the missing evidence, including less drastic measures like a curative instruction to the jury. While these differences made it inappropriate for the superior court to equate *Fletcher's* standard for giving a curative instruction with the pre-indictment delay test's requirement that the accused prove serious prejudice, the superior court will now need to consider *Fletcher* on remand to determine what sanctions, if any, are warranted in light of the state's loss of evidence here.

 The philosophy underpinning *Fletcher* is that some forms of prejudice can be cured and that a lack of some piece of evidence is not generally fatal to a case.[68] As the court of appeals found in *State v. Norman*,[69] "when the government has destroyed evidence through negligence ... a court should not dismiss the charges against the defendant unless it affirmatively appears that the lost evidence would have created a reasonable doubt concerning the defendant's guilt." Similarly, this court held in *Thorne v. Department of Public Safety*[70] that the state's failure to preserve a videotape of defendant's sobriety test should be cured by instructing the hearing officer to "presume the videotape would have been favorable to Thorne." On remand, the superior court should determine what sanctions, if any, are required in light of the evidence lost in this case.

## V. CONCLUSION

We REVERSE the decision of the court of appeals and REMAND to the superior court for further proceedings, including whether sanctions under *Fletcher* are appropriate and, if so, what they should be.

**63.** 650 P.2d at 418.

**64.** *Id.* at 418 (quoting *Putnam v. State*, 629 P.2d 35, 43–44 (Alaska 1980)).

**65.** *Id.*

**66.** *See supra* at Part IV.A. (test for pre-indictment delay looks to whether delay was reasonable and, if not reasonable, whether delay resulted in actual prejudice to defendant).

**67.** 650 P.2d at 418.

**68.** *Id.*

**69.** 875 P.2d 775, 777 (Alaska App.1994).

**70.** 774 P.2d 1326, 1331 (Alaska 1989).